would like to visit about two points in regards to why the court erred in granting summary judgment. I think there are multiple fact issues that were raised in the evidence, primarily the one that talks about the doctor certifying this patient as a medical emergency on disposition, and then I want to talk about the policies that were violated in multiple ways by both the doctor and the hospital. The record shows that at the end of the evaluation of DAF, Dr. Jones wrote in the record that patient's condition represents a certified medical emergency, and then discharged the patient to the house. The explanation given is that that was done for billing purposes, but billing records were obtained, and there are no policies that address that that I could find in the ones that were submitted to me. The closest thing that I found in the hospital records was on page 1497 of the record, which defines emergent medical condition, and that's in the hospital plan of patient services. It defined that as one in which there is a threat of immediate loss of life and or limb, which essentially tracks the EMTALA definition as well. So the fact that Dr. Jones wrote in the record and certified that this patient's condition represented a medical emergency raises a fact issue as to what was meant by that, and if it is in fact true, then it violates EMTALA by discharging him home. The second point that I would like to address is the screening requirement. As the court is well aware, the plaintiff can show that EMTALA was violated by showing that he received disparate treatment, and that could be done by showing that a policy used in the screening process is violated, or that other patients, and the key word is this, other patients with similar symptoms were treated differently, and we've done both of those in this case. We sought in request for productions 3, 4, 5, and 6 to the hospital those screening policies that applied in the emergency room. The hospital produced policies that are identified on the record on page 1534 and 1535. The emergency room hospital, I mean the emergency department policy says that the emergency department, and that's not just nurses, but the emergency department will follow the hospital-wide policy on pain management, and the pain management policy, which is identified on page, for the record, 1535, indicates that this policy will apply anywhere in the hospital where direct patient care is provided. It says affected departments, and then it says direct patient care, and then it goes through and lists 11 categories of things that need to be done by the hospital department, which would include the physicians and not just the nurses, and the reason we know that is because if you look at subpart C on page 1536, it talks about when clinicians observe variance between verbal self-reports and actions, then something is supposed to be done to ascertain why the patient is saying there's no pain at rest, but refuses to walk because of pain. The policy itself requires that to be done, and it also requires that a diagnosis be reached on page 1539, section 2. A search for a diagnosis is to be done, which is a doctor role, not a nurse role, which could be causing the pain. We deposed a corporate representative, and I went through at length the process that was done on an emergency room patient, and she describes triage, which is not part of EMTALA, and then she described what happens in the emergency room on page 1418 through 1420 of the records, she described in detail how this hospital-wide policy was supposed to be applied to patients in the emergency department complaining of pain. Do we know when this young person developed the MRSA? Do we know when? It's probably going to be impossible to tell when the first organism entered the body, probably two or three days later, but we know that the symptoms of MRSA that were discussed by Dr. Carlson as being significant is the gradual onset of increasing pain, which distinguishes it from pain caused by a fall or trauma, which is an immediate onset of pain, which then should decrease. So the type of pain, which is, again, addressed in the policy, is something that needs to be evaluated. Does that answer your question? Well, no, because, I mean, do we know that? I'm just wondering if he contracted the MRSA on the visit, the second emergency room visit, and that's what showed in the third emergency room visit. In other words, the assumption seems to be that he contracted it as a result of the fall, but I'm saying, could it have been that he contracted it actually at the second care facility and therefore didn't have it when he was discharged? I suppose that that's possible. I believe Dr. Carlson's affidavit addresses when he believes that the MRSA began and how it had progressed to the point that it had already started showing up on a CT exam with pockets on the leg. I get the left and right mixed up as to which one he complained of pain in, but the one that the CT showed fluid in was the opposite side. So the, I believe that, and I don't have the pages for that. Do you think it was ongoing at the time that he presented to the defendant's facility? That would be the typical clinical course of MRSA. It's not something that happens immediately. I've had it, I've actually had it myself recently. The thing that triggers the sudden explosion of symptoms is when it spikes a fever, which is when it enters the bloodstream. So once the MRSA goes from being localized in the tissue and hits the blood, that's when the patient becomes septic, and that's when you have the risk of septic shock, and then things can happen in a hurry at that point in time, which is- That had not happened at the time he was at the defendant's facility. That had not happened. That happened when he was discharged. He spiked a fever sometimes  I'm sorry, did I answer your question? Yeah. Can I ask you, this is off the merits, but this issue of appellate jurisdiction, we asked for briefing, I guess from your opponents, on the question of whether we had appellate jurisdiction over all of the appellees. Do you have any thoughts to offer on that? I'm going to have to admit, Your Honor, that I'm not an appellate lawyer. I'm a trial lawyer. I didn't even look at that part. And if it's a jurisdictional issue, I understand- As long as I get in front of a jury, I'm happy. I'm really kind of out of my water here. Practical matter, if we decide the question on the Daubert, it's going to be binding on the other party, irrespective of whether we have jurisdiction, it seems to me, of the separate appellee's claim. I would agree with that. From that standpoint, it's really not going to make, it seems to me that it's not going to make any difference whether or not there's jurisdiction to consider the same ruling with respect to the claim as to the doctor. So I can see, one, I appreciate your candor, but I can also see why it wouldn't make any difference to you. I know that if this case goes back, I've got to deal with the Daubert issue on them again anyway. And I really don't care, Judge, about, if they want to get up here and argue, I think my case is good enough to stay on its merits, let them get up here and argue, and I just don't want to waive anything. So whatever I say, yeah, I'm going to invoke the rule of ignorance and say I don't want to waive anything, but whatever y'all want to do is fine with me. You can't waive jurisdiction, subject matter jurisdiction, or repeal a jurisdiction, so regardless of whether you tried to waive it or not, you couldn't do it, so that should give you some comfort. All right, you don't want to talk about jurisdiction? That's fine. I just wanted to give you the address it, and so I wanted to be sure you had the chance to. And I noticed that. I thought that was odd, but I'll just do what I'm told. Yeah, that's fair enough. And we should have asked you, we, and I mean this collectively, should have asked you also, but it looks like we actually saved you since you didn't want to talk about it. You saved me from myself, Judge, so I appreciate that. I don't remember where I was now. Okay, you were on the merits. I was on the merits. You'd asked me a question about MRSA. Yeah, and I think you answered that, so you can proceed. I think it's notable that Judge Lynn did not address the certified medical emergency in her judgment. She didn't even mention that. I thought that was unusual because the plain meaning of medical emergency is a medical emergency. Well, I guess the problem is people go to emergency rooms for all kinds of stuff, and I guess they're distinguishing between, their argument is that they're distinguishing between somebody who has, you know, a valid complaint and somebody who's just there because, I mean, they're just there. They don't really have a problem. And all kinds of people show up in emergency rooms, including people who really just want to talk to someone or just really have no complaint at all, versus someone who is about to die, and that whole spectrum, and that's what they're arguing. Do you have contrary evidence as to what that means? I have just the common plain meaning of the rule that I believe raises a fact issue that if you're going to put something that reads as similar as emergency medical condition on disposition, and you don't have policies that say this is why you're doing it, but you've got a definition that's kind of like that, that says it means likely to deteriorate or cause the risk. But emergent and emergency to me are very different words. They sound a lot alike, but they're not similar words at all. I can see the difference between urgent, but to me, emergency and emergent... Emergent means it's coming about. Emergency means I need to address it right now. I don't see those as the same word, but... But that actually helps me because an emergent is less of an emergency than an emergency, and it still is defined as... Well, no, because it's ongoing, and then that's why they have to refer it to someone. I mean, their argument is they dealt with this young person and addressed his condition and moved on, perhaps negligently so, but they did address it. That's their argument. And that's exactly why we should have a trial on this so that we can decide what that means because I don't think it's as a matter of law. I guess what I'm trying to say inartfully is there's nothing out there that says what that means as a matter of law. And there's certainly enough... I'm going to say this because I think this is even more fundamental. I mean, in your life, you have the privilege, if you will, we'll call it that, of taking people to the emergency room on occasion, and they usually sit there for hours, and this young person was seen almost immediately and triaged and given all these tests, and this... It's hard for me to say there was no... You're trying to argue there was no evaluation done, and I mean, they're seeing them almost... We've had people in Dallas who sat in the emergency room with a gunshot wound for 20 hours, and so I know that's not the standard. I agree. I'm not holding that up as a standard. I'm just saying this seems hard to square with the idea of they didn't do anything. Maybe they didn't do it very well, but to say they didn't do anything, can you really support that? I'm not saying they didn't do anything. What I'm saying is that EMTAL requires that not just any old medical screening examination you want to do occur. It says an appropriate medical screening examination must be done, and then, because it's not... But they did a bunch of tests. But in the standard... In other words, you've got to show that it was cursory. Sir? Don't you have to show that there's a fact issue that it was cursory? And I don't know how you can... When they did what they did, and there's a record of all that, how is... With respect to the cause of action that you have before us today, it's got to be cursory. We're not talking about negligence. We're not talking about that they could have done more or they should have done more. It's got to be cursory, and it's hard in my mind to say that this was the type of behavior that when they created this particular remedy, this particular act that you're saying is violated, that they were... Congress was looking at this type of behavior, that this was the type of behavior that they were trying to stop. And you're right, in a sense, in that there are three ways to prove that an adequate screening exam wasn't done, and one of them is you can show that the examination was so minimal that it was cursory. And we believe we've got evidence of that that creates a fact issue based on what the mom says. But more importantly, the other two ways that you show an EMTALA violation based on battle and all the cases out there are, did the hospital follow screening procedures? And if you look at Porta and Southern, any violation gives rise, unless it's a de minimis one, which would be like triage, but this is not a de minimis policy. This is people that were in pain and the elevated white blood cell count. So you can show a violation of policy, which creates an EMTALA violation, or you can show that other patients with similar symptoms were not treated the same, and we've got three charts of three patients with similar symptoms that were all transferred for a more in-depth evaluation. So I believe that we have proven a race of fact issue on, and that doesn't even take into account that they've established the standard of care as their standard. That is, we show an EMTALA violation four ways, Your Honor, I believe. Okay. You've saved some time for rebuttal, counsel. Thank you. All right. Mr. Bailey? May it please the Court. Congress, as a matter of fact, enacted EMTALA to prevent patient dumping. That's what this Court said in the Marshall case in 1998, and what this Court reiterated in the Guzman case 13 years later in 2011. That's the purpose of EMTALA, to keep uninsured patients from being dumped from hospitals. A review of the facts in this case shows clearly that Lake Granbury Medical Center did not engage in patient dumping in any of the ways asserted by plaintiffs in their brief. The fact of the matter is the facts in this case are eerily similar to the facts in the Guzman case, yet there was even more screening done in this case beyond what was done in Guzman. In the Fifth Circuit, this Court held that the summary judgment in Guzman was appropriate and affirmed it, and Judge Lynn's summary judgment in this case should be affirmed as well. The first argument that plaintiffs make in their brief is that the examination, the screening, was so cursory as to amount to no examination whatsoever. Candidly, I don't think that argument even passes the straight-face test. That's the argument that Judge Lynn addressed in her opinion, first off, going line by line through what was done for this patient. The fact of the matter is he was seen right away. He underwent several tests, blood tests, urine tests, CTs. He underwent over $10,000 worth of testing, according to the medical bills that are in the record today. Would the doctors know he's not insured? The doctor did not know he was uninsured in this case, and that's in his deposition testimony as well. Is there evidence that the doctor did know? No, there is no evidence. Does that matter to this analysis? I don't believe that it does. I think the opinions that have come from this circuit and others say that the motivation doesn't necessarily need to be examined to find an EMTALA violation. But the fact of the matter is the patient did go through an extremely thorough screening. Again, I think when you look at any of the cases cited in anyone's brief in this case, the screening that was done in this case is above and beyond what was done in this case. Do you have to win the Dr. Carlson exclusion argument to win the summary judgment was properly granted argument? Not at all. Those are completely separate. Do we even have to reach it if we agree with you that they didn't show the... Because doesn't he offer some opinions on this? So don't we have to consider those unless he is stricken? His opinions that were struck deal with causation and medical causation. I think... It has to do with the negligence claim, right? His opinions? Yeah. The excluded opinion has bearing on the negligence claim or does it have bearing on this other claim for dumping? Didn't he say they failed to follow protocol or something of that nature? That gets to his opinion with regard to EMTALA. But on their alternative theory of recovery of the negligence, yes, his opinions were struck as to that as well. He did criticize the screening that was done. And so don't we have to consider that unless it's stricken or are you saying that even considering that it doesn't cause us to have to reverse? His opinion with regard to that, we filed objections to his affidavit in that regard. Judge Lynn granted, sustained those objections. I get that. What I'm saying is if we were to disagree with the judge and consider Dr. Carlson's affidavit on the EMTALA matter, would you nonetheless win the summary judgment appeal or not? We would still win. And tell me how. Because they have to show one of three things to raise an EMTALA violation. They have to show that there was a cursory screening. The only way that Dr. Carlson attempts to get into standard of care with regard to EMTALA is this pain management policy. That's the only criticism he has of the nurses. He says the pain management policy was violated. But the fact of the matter is the pain management policy is not an EMTALA screening policy. That's what Judge Lynn found and that's what the evidence shows. The evidence is they have not shown any violation of any EMTALA screening policy. There are specific EMTALA screening policies that this hospital has. Specific ER policies that this hospital has. Dr. Carlson was asked about them in his deposition. He found no violations of any of those policies. The only policy he says we violated is this pain management policy. But the pain management policy is not an EMTALA screening policy. So it doesn't get them there on EMTALA. But to go even further in that regard, if for some reason the court were to say, no, it is an EMTALA screening policy, even though there's case after case showing triage policies aren't, other unrelated policies don't give rise to EMTALA, to the extent that this was an EMTALA screening policy, which again we say it was not, and I think the evidence is clear it was not, any violation of it was de minimis at best. Because the whole purpose of the pain management policy is to assess the patient's pain. But the facts that are in the record are the patient's pain was assessed, not only when he showed up, but when he left. Well, the doctor's notes acknowledged the pain that was reflected by the mother and made an estimation of that or a conclusion and said, well, the pain varies with who's in the room. Absolutely. At the most, that would show that he might have been wrong in his assessment of pain, which has to do with negligence. It doesn't have to do with violating their EMTALA policy. That's exactly right. Their claim is a misdiagnosis claim that they're trying to recast as EMTALA. And again, as Judge Bonavius pointed out, the doctor was aware of the pain. That's in the record. At the time he made the record, he testified to it. There's no dispute about that. Even Dr. Carlson testified in his deposition, as part of our summary judgment record, that he knew that Dr. Jones was aware of the patient's pain. The fact that he did or didn't do anything about it may go to a negligence question against him, but it doesn't go to an EMTALA failure to screen. He was screened. The pain was revealed to him. He chose to, through his differential diagnosis process, arrive at the decision this pain is due to a contusion from a fall. They say, no, it's due to an MRSA soft tissue infection. Again, that goes to his judgment, Dr. Jones's medical judgment, and the exercise of that judgment. That's a negligence claim. They've got remedies for that. They can bring a state law negligence claim against Dr. Jones. They've chosen to bring an EMTALA claim because he was, whether or not he Not only that, I thought there was something in the record that, with respect to the negligence claim, that he told the Court that he didn't have a negligence claim against the hospital. Absolutely. At the hearing, we cited to it in the record specifically, plaintiffs admitted they have no negligence claims against the hospital outside of EMTALA. Judge Lynn asked counsel that twice. He admitted that twice. So is there a dichotomy here between the hospital being liable for the nurses but not the doctor, and then the doctor being liable for his own conduct? Is that why you keep talking about the nurses? Because I know a lot of hospitals take the position that doctors are independent contractors and, therefore, they're not liable for their conduct, but they can't take that position on the nurses, obviously. Is that the situation here? Yes. And they've not alleged that we're responsible for it. He was an independent contractor, A. But, B, the EMTALA duty is only as to the hospital. A doctor doesn't have a No, I understand that, but I'm talking about the negligence, that what would be the negligence against the hospital if it wasn't waived by this statement to the judge. It would be based on the nurses and not on the doctor. Absolutely. Their alternative theory that they've played is nurses And they don't have a lot on that. They've got nothing on that. So that's why it wasn't much of a waiver if it was one, because the nurse didn't do anything. It was the doctor who made the call that is now alleged to be wrong. And to just kind of set up the procedure on that, Dr. Carlson's asked in his deposition any criticisms of the nurses, none except violation of pain policy. So he's got no negligence opinions. We file our summary judgment. All of a sudden, Dr. Carlson's got an affidavit saying negligent, grossly negligent. We objected to that, moved to strike it. The court did strike it. That was not struck on Daubert. That was struck on a discovery matter. That's correct. That's correct. That wasn't part of the Daubert motion. That was our objections at that time. I get that. And so they've got their first theory. There was a cursory exam. I think Judge Lynn, again, lays that out why it was anything but cursory. Their second allegation to try and give rise to an EMTALA claim is that there's a violation of this pain management policy. That's not a screening policy. You said that. What? And so then we move on. Their next argument is that apparently the standard of care for Dr. Jones is somehow incorporated into our EMTALA process. They cite absolutely no cases for that. And, in fact, there's no evidence in the record that somehow the hospital's any violation of the standard of care by its physician is a violation of its screening. So there's no basis for that argument at all. And then, finally, their disparate treatment argument. They want to compare it to these three other patients. That fails for a number of reasons as well. The first being whether or not a patient receives disparate treatment, you have to compare the treatment he received and that's not the medical treatment, but the treatment as to his screening. Was he treated? Let me ask you a more fundamental question. I mean, is the hospital in a position to admit someone that a doctor has discharged? No. The doctor has to be the... The doctor's the one making the medical... And I'm not saying he made the wrong medical judgment. I'm not going there. But from the hospital's perspective, the doctor has to do the screening. And if the doctor does that wrong and therefore discharges a patient who should have been discharged, the hospital's got to go with that. It's like on a plane, the pilot gets to decide if we have an emergency need to land or not, not the flight attendant. The EMTALA law says that a hospital can delegate the screening process to a doctor, which every hospital does as a practical matter. Only a doctor or a physician extender, nurse practitioner, physician assistant, is going to do the actual screening. The question under EMTALA is was it a uniform screening? Do your doctors, you know, treat like patients similarly in the way they do the screening? Not do they give them the same absolute medical treatment? And that gets to a couple of issues. One, are there similar patients who were treated differently? Absolutely not. The three comparator patients, and we go through that, how they are... I mean, to be fair to the plaintiff, he got the comparators from you. You didn't give him a bunch of kids that had fallen off the trees and what happened to them. He didn't ask for those. And that's what he should have asked for. He said he asked for the comparators and you gave him these three people. That's not what the record shows. What they asked for, they wanted patients that were seen in the ER a year before or a year after who had a fever and a high white blood cell count or a high white blood cell count and unexplained limb pain. The fact of the matter is they wanted to search by the ICD-9 codes, which were done. These are the only three that he asked for, to make it a fair comparison. Yes. Because that's what we have here is these aren't similar patients. What he's saying is, well, these three patients at the end of the day, in fact, may have had infection. My plaintiff in this case had an infection. Therefore, they're similar because they had white blood cell counts. But that's not what the law says. The law says you don't... How high was this by comparison to normal? What's normal for a kid? Well, our position is it wasn't high. It was outside of the range, which... The range is weird. I know that about white blood cells. I want to say it's, at our hospital, 12, and he was 14.5, 12,000. But in other words, some people run high and some people run low naturally off the range. Absolutely. And Dr. Jones was asked about that. That's why I say it's weird. I don't mean it's weird what you said. Sure. And Dr. Jones, and you can see in the notes he made at the time, he said he reviewed the labs and said no significant abnormalities. If he was wrong about that, they can sue him for negligence. And that's a great comparison toward the Guzman case. In the Guzman case, the child had a high white blood cell count, and the doctor didn't even look at the labs. They weren't even provided to him. Yet the hospital still fulfilled its duty in the Guzman. Here, we gave him the lab results that he ordered.  I want to get back to the comparators. The problem with the comparators is that he asked for a group of people who had similar white blood cell counts and complaints of pain. Yes. Precisely. Did you get to finish your question? I think the comparator patients, I don't think we even need to get to those. Because again, we look at Guzman where they tried to say, Your Honor, we can't say this wasn't similar because we haven't seen similar patients. And the court says you don't even get to that in this case. You have to show, it's your burden plaintiff, to show there was not a uniform screening. It's not the hospital's burden to show we screen everybody uniformly. It's the plaintiff's burden to show this patient was screened differently than other patients. But it's not only, what the case law says is, what is the treatment for other patients who are perceived to have the same diagnosis? It's beyond question in this case that Dr. Jones perceived this patient to have a contusion due to his fault. That's what he wrote out. That's what he documented. If his perception is wrong, that's negligence. Or if in fact the patient had something that was similar to even these three comparator patients, it doesn't matter. Because what the diagnosis in fact is doesn't matter. It's what is the patient, what is the diagnosis that is perceived. Did you all get your questions answered? Okay, thank you. May it please the Court. Your Honors, the district court did not abuse its discretion in excluding the causation opinion. And I know you only have five minutes, but just very quickly, if we were to conclude that we don't even have to reach the whole Dr. Carlson exclusion on Daubert issue, then you would have to concede there's no intertwining necessary for pendant jurisdiction, right, if we were to conclude that with respect to the hospital? I think if the court is not going to reach that issue, that's correct. If the court is going to reach the issue as to the hospital and resolve that order, we believe that you're intertwined. We do. All right, go ahead. How intertwined do you have to be? I mean, the circuit has lots and lots of cases where claims are made against different parties. And in which preliminary or interlocutory orders are made that are similar or made on the same basis. If because one order is appealable, all the orders on the other cases where that is decided, we're going to have jurisdiction in tons of cases we've never entertained before. And not only that, we have also under this pendant jurisdiction issue, I don't think you've got a certified question and you don't have a final order. If we do it under pendant and we still have discretion, even if it is inextricably intertwined, not to hear it. What is there so special or intertwined or necessary or dependent about your case that we can't decide even if we decide the discovery motion? Why is our analysis of that in any way dependent upon the same order? Not that they would be the same, but dependent. Which is the one exception that we've decided. It wouldn't otherwise be appealable. It's intertwined, inextricably intertwined, and it's dependent. And that we should use our discretion to reach it. Your Honor, I think with respect to the two Daubert orders, if that's the question the Court is posing, I think they're inextricably intertwined, one, because they do raise the exact same arguments. They're intertwined because they're the same. Every case that we have in Texas, Louisiana, and Mississippi where the judge makes the same ruling on multiple claims, they're intertwined enough because it's the same, it relates to the same order. Actually, there's two different orders, but it's the same issue. I argue, yes. I don't know whether we've got room in our courtroom big enough to entertain all the appellees that would be up here. In addition to that, Your Honor, we do think that the second prong of pendant jurisdiction is met under these facts because in this case, review of our appellee's brief on that issue would provide meaningful review of the Daubert question because the other appellee has adopted all arguments. Well, that means you just have issue preclusion, right? If we address it, if we don't address it, it's not before us in the case that's before us. And if we do address it, it's probably going to be controlling because it's for the same reasons. I concede that's true. So, let's give you a minute or two to address the merits then. Thank you, Your Honor. We believe and contend the District Court did not abuse its discretion in excluding the causation opinions of Dr. Carlson under General Electric Company v. Joyner and subsequent precedents of this Court including more because the District Court had ample discretion to determine that too wide of an analytical gap existed between the underlying data and Dr. Carlson's causation opinions. The overarching analytical gap in the case is Dr. Carlson's failure to reliably demonstrate in light of the facts that occurred on June 30th at Cook Children's when DAF was septic that a transfer the preceding morning when he was not septic would have made a fundamental difference in his outcome. Do you have a position on when the MRSA was contracted? We don't think anybody knows, Your Honor. In fact, Dr. Carlson has testified, it's my understanding from the record, that he is not certain. Does this have to do with a negligence claim or the other claim? No, we believe the causation issue actually goes to both claims. Because even the EMTALA claim has to cause harm. It must be directly resulting from the violation. Otherwise, there's no lawsuit. There may be a technical breach but not a lawsuit. I agree. So you're saying the causation matters to everybody. It does. Does that answer your question? So in terms of the overarching analytical gap, there are a number of examples we cite in the brief. As the district court astutely pointed out, the testimony of Dr. Carlson required the court to make multiple logical leaps to tie the facts to the conclusions. Just to cite one example of a logical leap, Dr. Carlson's conclusion that had DAF been transferred to Cook Children's on June 29th, he would have received IV vancomycin within six hours. That conclusion is contradicted by the very facts that occurred on June 30th, for nine hours, when he was septic. Dr. Carlson knew those were the facts. Dr. Carlson testified in his deposition, despite knowing that for the first nine hours at Cook Children's on June 30th, DAF was on ceftriaxone, which Dr. Carlson conceded was not the antibiotic of choice to treat DAF's infection. Nevertheless, Dr. Carlson testified in his deposition, the administration of ceftriaxone for the first nine hours was not even part of his opinion about the causation of DAF's rapid decline. I gave you extra time, and it's now. And we urge affirmance of the district court's ruling. Thank you, Your Honors. I want to clarify the disparate treatment issue. And when we ask for patient charts, we ask for, and Dr. Carlson has an affidavit in the record that sets forth all the things that he needed and what he thought he needed to do to get this comparison. And there were probably 40 or 50 IDC codes that we sent to try to get matches of pain, elevated white blood cell count, which the elevated differential count makes a huge difference for, because you can't have an elevated white blood cell count just walking around. But the differential, the neutrophil count, is what kind of set it over the edge here. And we did that following the law. And the law says, when I read the battle in those cases, it said in Marshall, patients with similar symptoms, every case out there, there's not a single case out there that I could find that says you've got to find similar patients. You may never find similar patients. That's why EMTALA is directed towards the symptoms that the patient has. And if you look at the cases... Isn't it directed towards the screening? Right. All these people got the same screening that got a different outcome, and that's what you're complaining of. But his argument is it doesn't matter what the outcome is, it matters what the screening is. And your client got a very thorough look. And as I said, more thorough than what I've read about in the paper and experienced when I've taken a loved one and so on. The other patients got more treatment and more screening and evaluation because they were put in the hospital and additional tests were done. That's a different outcome. No, that's additional screening and treatment. In other words, if you run five tests in the ER and send them home, that's different than if you run five tests. Yeah, we need to put them in the hospital. We have to observe them every 15 minutes, take vital signs every 30 minutes, do input, output, x-rays. You get a higher level of evaluation and assessment in a hospital or you get transferred to a higher level of care like two of these patients did. This comparison that you have seems to require the doctor to come to the same conclusion. In other words, if they have similar symptoms and they don't reach the same conclusion, then it's a violation of this statute. Whereas the conclusion here was, after examining them, doing the tests and whatever, was a different conclusion that the doctor made of people that may have had similar symptoms. Now, if they've got to have the same conclusion, then you're going to be treating, in order not to have a violation, you're going to have a violation unless you come to the same conclusion as if they have similar symptoms. They just have to be treated the same. Yeah, but the problem is you're saying we have to treat an 81-year-old with COPD and who's a smoker and this and that, the same as a young kid who has no prior history of any problems and so on. And that doesn't sound right to me just on the face of it. Well, that's a medical issue. Well, that was what was done here. The medical determination was this kid is different from the elderly patient that we had before. But is that not a fact issue? If we say that he should have been, that these three patients are similar and he was treated differently? The question is fact issue on EMTALA, not on the negligence of the doctor. Right, and these patients receive additional treatment and screening from the hospital. They were transferred. Because there was a conclusion. I'm not sure I understand the question. Because the person presents differently. Because an elderly patient with certain symptoms is different from a young boy with certain symptoms. And therefore, the screening ultimately may be different after the initial screening. They both got the same initial screening, but there may be a different conclusion. They're not going to hospitalize every young kid. Because guess what? You can get MRSA in the hospital. So hospitalizing everybody who presents with the exact same symptoms regardless of their other medical history doesn't strike me as something I want to be requiring. There are multiple medical conditions that the treatment and screening regimens are the same for adult versus a child. You can compare a chest pain protocol. It might be different for an 80-year-old versus an 8-year-old. Whereas, extremity pain, elevated white blood cell count and differential is treated the same in adults and in children according to what Dr. Carlson's affidavit says. So there may be some circumstances where you don't treat them the same because of who the patient is. But that's why the symptoms are what is looked at as opposed to the patients. You could never find two patients that are exactly the same. Okay. Council, thank you. Did I cut you off? No, the red light came on. I think you got some extra time before. So I think you all ended up with even time. All right. Thank you very much. Thank you, Council. Thank you, everybody, for your arguments. This concludes this panel and this sitting. And we are adjourned. And your cases are under submission.